# EXHIBIT 44

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EXELTIS USA, INC.,
LABORATORIOS LEON FARMA, S.A.,
CHEMO IBERICA, S.A. and
CHEMO RESEARCH, S.L.

          Plaintiffs,

v.

LUPIN LTD. and LUPIN
PHARMACEUTICALS, INC.,

          Defendants.

C.A. No. 1:22-CV-00434-RGA

JURY TRIAL DEMANDED

## DECLARATION OF GRAHAM BUCKTON, PH.D.

I, Graham Buckton, declare and state as follows:

### I.    Introduction

1.    My name is Graham Buckton and I have been retained by McGuireWoods LLP, counsel for Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc. (collectively, "Lupin") in the above-captioned matter to provide technical opinions regarding U.S. Patent Nos. 9,603,860 (the "'860 patent"), 10,179,140 (the "'140 patent"), 10,603,218 (the "'281 patent"), 10,849,857 (the "'857 patent"), 10,987,364 (the "'364 patent"), 11,123,299 (the "'299 patent"), 11,291,632 (the "'632 patent"), 11,291,633 (the "'633 patent"), 11,351,122 (the "'122 patent"), 11,413,249 (the "'249 patent"), 11,439,598 (the "'598 patent"), 11,452,695 (the "'695 patent"), 11,478,487 (the "'487 patent"), 11,491,113 (the "'113 patent"), and 11,504,334 (the "'334 patent") (together, the "patents-in-suit"). I have personal knowledge of the facts contained in this Declaration, and, if called as a witness, I could and would testify competently thereto.

2.      I understand that in the above-captioned matter, plaintiffs Exeltis USA, Inc., Laboratorios Leon Farma, S.A., Chemo Iberica, S.A., and Chemo Research, S.L. (collectively, "Plaintiffs") have alleged Lupin infringes certain claims of the patents-in-suit.

3.      I have been asked by Lupin to offer an expert opinion regarding how a person of ordinary skill in the art ("POSA") would understand the claim terms "particle size," "d10 particle size," "d50 particle size," "d90 particle size," "the particles have a d50 of less than," "the particles have a d50 ranging from," "the particle form has a d50 in the range of," "the particles have a diameter less than," "having a diameter less than," "has a diameter of," (collectively, the "Particle Size Terms"), and  "wherein the particles have surface area ranging from," "wherein the particle form has a specific surface area from," "surface area ranges from," and "surface area ranging from" (collectively, the "Surface Area Terms") as recited in the asserted claims of the patents-in-suit.  In connection with my analysis, I have reviewed the Second Amended Complaint filed by Plaintiffs, the patents-in-suit and their respective file histories, the parties' preliminary claim constructions, the Joint Claim Construction Statement filed with the Court and corresponding exhibits, and Plaintiffs' Opening Claim Construction Brief and corresponding exhibits.

4.      The opinions contained in this Declaration are based on my years of education, research, and experience, as well as my investigation and study of relevant materials.

## II.    Qualifications

5.      I am currently working as a pharmaceutical consultant and am an Emeritus Professor of Pharmaceutics at UCL School of Pharmacy, University of London.

6.      I received my Bachelor of Pharmacy from Chelsea College, University of London in 1981, a Ph.D. from King's College, University of London in 1985, and a Doctor of Science from University of London in 1997 for my research work in pharmaceutical materials science.

7.    From 1988 to 2015, I was on the faculty of the School of Pharmacy at the University of London (which became known as the UCL School of Pharmacy). I became a Professor of Pharmaceutics in 1998 and served as the Head of the Department of Pharmaceutics from 2001 to 2007. My research interests during my academic career related to investigating the behaviour of pharmaceutical materials, in relation to pharmaceutical processing and formulation. This work included modifying the physical properties of powders by crystallisation and physical manipulation as well as preparation and analytical characterisation of powders for pharmaceuticals. My research work included the testing of particle size distributions and surface area determinations of powders.

8.    Prior to joining the faculty at the School of Pharmacy at the University of London, I was a Lecturer in Pharmacy at Chelsea Department of Pharmacy at King's College at the University of London from 1984 to 1988. I also worked as a pre-registration pharmacist at the Charing Cross Hospital from 1981 to 1982, as well as a *locum tenens* pharmacist from 1982 to 1988. In 1987, I was seconded at Ciba-Geigy Pharmaceuticals in their Advanced Drug Delivery Research unit for about 6 months.

9.    Additionally, in 2000, I founded, and was Chief Executive Officer of Pharmaterials Ltd, a company that provided salt selection, polymorph screening, pre-formulation, formulation development, analytical development, stability testing, and GMP clinical trial manufacturing. Particle size control and measurement were key properties of active pharmaceutical ingredient (API) particles that were used in the formulations that we developed in the company.   I sold my final stake in the company in 2012.

10.     I recently retired after over 20 years of service as a member of the Chemistry, Pharmacy and Standards Subcommittee of the Commission on Human Medicines[1], and I also recently retired from the steering committee of The Handbook of Pharmaceutical Excipients, which is a definitive work presenting monographs on the properties and typical uses of frequently used excipients. I was Editor of the International Journal of Pharmaceutics for a 10-year period and served on the editorial boards of several journals, including Pharmaceutical Research, the American Association of Pharmaceutical Scientists (AAPS) Journal and AAPS Pharm Sci Tech. I have received a number of awards and have been made a fellow of the Royal Pharmaceutical Society, the Royal Society of Chemistry, AAPS and the Academy of Pharmaceutical Sciences of Great Britain.

11.     I have authored over 180 peer-reviewed journal publications as well as a book, and I have given over 130 invited and external lectures since 2001. I have also been named as an inventor on a number of patents and patent applications.

12.     A copy of my curriculum vitae is attached as **Appendix A**.

**III.    Legal Standards**

13.     I am not a lawyer and have no training in the field of law and therefore I offer no opinions on the law. However, certain legal principles that relate to my opinions have been explained to me.

---

[1] The Commission on Human Medicines (CHM) is the body which grants and revokes marketing authorisations for drug products in the UK, equivalent to the FDA in the US. Decisions are made through expert groups, following assessments by staff at the Medicines and Healthcare products Regulatory Agency (MHRA). Prior to CHM, UK medicines regulation was through the Committee on Safety of Medicines (CSM). I was a member of CSM and chaired its Chemistry, Pharmacy and Standards committee.

14.     I have been informed that claim construction is the process by which a court determines the proper meaning and scope of certain claim terms or phrases used within the claims. I understand that patent claims are construed from the perspective of a person of ordinary skill in the art at the time of the invention in light of the "intrinsic materials," which I understand to include the language of the claims themselves, the patent's specification and the patent's prosecution history, including the cited references. I further understand that materials outside of the patent and its prosecution history (called "extrinsic materials") can be used to understand the meaning and scope of the claim terms or phrases. I understand that extrinsic materials are less significant than intrinsic materials in determining the meaning of a patent's claims.

15.     I have been further informed that that a patent's specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention. I have been informed that this is referred to as the "definiteness requirement." I understand that to meet the definiteness requirement, a patent claim must be precise enough to afford clear notice of what is claimed in order to apprise the public of what subject matter is still available to them. I further understand that a patent claim is indefinite if its language, when read in light of the specification and prosecution history, does not inform, with reasonable certainty, a person skilled in the relevant art about the scope of the invention. I understand that whether or not a claim is indefinite is evaluated from the perspective of a person having ordinary skill in the art. I understand that indefiniteness is a legal issue that ultimately will be decided by the Court. I also understand that even if a claim term initially appears indefinite, the rest of the claim, the specification, the prosecution history, or other information may resolve the ambiguity, and demonstrate that the claims convey to one of skill in the art with reasonable certainty the scope of the invention claimed. I understand that the claim must be considered as a whole to determine

whether the definiteness requirement is met. I further understand that while a claim is not required to be defined with absolute precision, it must still clearly define the scope of the invention with reasonable certainty.

16.     I also understand that a claim term's "plain and ordinary meaning" refers to the ordinary and customary meaning that the term would have to a POSA at the time of the invention.

## IV.    Level of Ordinary Skill in the Art

17.     I understand that patents must be interpreted from the perspective of a "a person of ordinary skill in the art" ("POSA"). I understand that a POSA is a hypothetical person to whom an expert in the relevant field could assign a routine task with reasonable confidence that the task would be successfully carried out. I further understand that a POSA is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to innovate, whether by extraordinary insights or by patient and often expensive systematic research. I understand a POSA is also a person of ordinary creativity, not an automaton. I understand that the hypothetical POSA is presumed to have knowledge of all references that are sufficiently related to one another and to the pertinent art, and to have knowledge of all arts reasonably pertinent to the particular problem that the claimed invention addresses. I further understand that factors that may be considered in determining the level of ordinary skill in the art may include: (i) type of problems encountered in the art; (ii) prior art solutions to those problems; (iii) rapidity with which innovations are made; (iv) sophistication of the technology; and (v) educational level of workers in the field.

18.     In my opinion, as of July 28, 2010, which I understand to be the earliest claimed priority date of the patents-in-suit, the POSA would include a person having a doctoral degree in pharmaceutical sciences, a field of chemistry relating to drug formulation or development, or a

related field with at least two years' experience formulating solid dosage forms. A POSA would also include a treating gynaecologist or obstetrician with at least two years' experience prescribing oral contraceptives, including progestin-only contraceptives. A POSA may have an education level lower than a doctoral degree in pharmaceutical sciences, chemistry, or a related field if they have commensurately more relevant work experience. A POSA may have also worked as part of a multi-disciplinary team and drawn upon not only his or her own skills, but also consulted with others on the team having specialized skills to solve a problem. As of the earliest priority date of the patents-in-suit (July 28, 2010), I qualified as a POSA.

19.      I understand that in the course of prosecution of U.S. Patent No. 10,849,857, which is not asserted in the above-captioned matter, but which is a parent application to numerous of the patents-in-suit, including but not limited to the '364 patent, Plaintiffs' filed the Declaration of David F. Archer, M.D. dated June 28, 2011 in which they defined "ordinary skill" to mean "persons with doctoral training, master's training, or pharmacy training with significant and substantial experience in chemistry, biochemistry, chemical or biochemical engineering, molecular or cellular biology, or pharmacology." Whilst I disagree with this definition of a POSA, at least with respect to my analysis in this Declaration, my opinions would not change under Dr. Archer's definition.

## V.      Claim Construction Opinions

### A. Background of the patents-in-suit and the shared specifications

20.      Although there are 13 patents-in-suit here, all 13 share two common specifications. The first of those two specifications is shared by the '860 patent and the '140 patent, both entitled "Pharmaceutical compositions comprising active drugs, contraceptive kits comprising active drugs, and methods of administering the same." The '860 patent and the '140 patent are both directed to methods of providing drospirenone to overweight women having specific BMIs. Both

the '860 patent and the '140 patent have claims relating to particle size and surface area, including, for example, '860 patent claim 25, which recites that the particles "have a specific surface area from about 2000 cm$^2$/g to about 8,500 cm$^2$/g" and claim 28, which recites "a particle distribution of the active contraceptive drug is characterized by: (i) a d90 particle size less than about 100 μm, and/or (ii) a d50 particle size ranging from about 10 μm to about 60 μm, and/or (iii) a d10 particle size more than about 3 μm."

21.    Although the specification of the '860 patent and the '140 patent define the terms "d90 particle size," "d50 particle size," and "d10 particle size," (e.g., '860 patent at 25:48–59) it does so without providing adequate guidance, because it does not provide any indication of measurement method nor type of distribution.  There is an absence of specificity on the methods to be used to determine surface area, simply stating that "[t]he specific surface area may be experimentally determined using the BET method (gas adsorption method)". ('860 patent at 23:46–47)

22.    According to the specification of the '860 patent, particle size distribution "may be determined by well-known methods of the prior art such as sieve analysis, laser diffraction methods, photoanalysis or optical counting methods."[2] ('860 patent at 26:13–17)

23.    The remaining 11 patents all share a second common specification.  Each of these patents is entitled "Synthetic progestogens and pharmaceutical compositions comprising the same" and each is generally directed to drospirenone pharmaceutical compositions having a specific particle size and a specific dissolution rate.  The specification of the '364 patent is representative of the specification of all 11 patents.  Many of these patents have claims relating to particle size,

---

[2] I am taking "photoanalysis" to be what I would describe as "image analysis".  I am taking "optical counting" to mean "microscopy".

including, for example, '364 claim 1 which recites "(i) a median particle size ranging from 15 micrometers (μm) to 25 μm, (ii) a d90 particle size of less than 100 μm; and (iii) a d10 particle size of more than 3 μm;" '633 patent claim 1, which recites "a median particle size ranging from 10 micrometers (μm) to 60 μm;" '598 patent claim 1, which recites "particles that have a surface area ranging from about 2000 cm$^2$/g to about 8500 cm$^2$/g;"'133 patent claim 22, which recites "the particles have a diameter of less than 200 micrometers (μm);" and '133 patent claim 23, which recites "the particles have a d50 of less than 70 μm."

24.     As with the '860 specification, the '364 specification defines "d90 particle size," "d50 particle size," and "d10 particle size," ('364 patent at 22:22–33) but it does so without providing adequate guidance, because it does not provide any indication of measurement method, nor type of distribution.

25.     Although the '364 specification states that "[t]o obtain drospirenone in particle form having the specific surface area and/or the particle size distribution as described above, one of skill in the art may use well-known methods of the prior art such as a milling process optionally combined with a sieve process" ('364 patent at 23:43–46), this is describing (albeit in a rudimentary way) how to obtain particles of different sizes, and not how to measure the size distribution of the particles that have been made.

26.     This diverse range of sizing methodology and data presentation makes the claims indefinite in that a POSA would not know whether a batch of drospirenone would fall within or without of the claim bounds.

27.     The method of surface area measurement that should be used with respect to the claims is not described, the specification merely states that "[s]pecific surface area may be experimentally determined using the BET method (gas adsorption method)" '860 patent at 23:46–

47.  The specification does not exclude other ways of determining the surface area, for example through methods of particle size analysis, neither does it limit the gas used in the "gas adsorption method."  Changes of gas and changes to different methods would give rise to different results.  A POSA would not know whether their sample falls within the bounds of the claim given the range of methods that can be employed.

### B.  Measurement of particle size

28.     There are three discrete issues when measuring particle size: (i) how to define the size of a particle as a single number (the concept of an equivalent sphere); (ii) how to measure the size of particles within a distribution, including how to take a representative sample; and (iii) how to present the particle size data as a distribution.  Each of these issues can significantly affect the results of any particle size distribution analysis.[3]  I discuss each below.

*Equivalent sphere diameter*

29.     Materials are 3-dimensional objects, the size of which is usually described by 3 numbers, the length, width and height.



---

[3] Aulton's "Pharmaceutics – the science of dosage form design" (1988), Chapter 33 – Particle size analysis.

30.    It is rather more complicated with irregular particles of API which are often elongated, but irregular, shapes, and in order to accurately characterise the size of a given particle it would be necessary to measure multiple dimensions.  It is therefore more convenient, and practical, to approximate each particle to a sphere.  A sphere is the only geometric shape for which a single number defines its dimensions, i.e. the diameter.  Each API particle is therefore defined by reference to its "equivalent sphere diameter."   A POSA would understand the patent claims to relate to an equivalent sphere, and would not assume that the particles that are measured are in fact spherical.  So a claim to "particle size ranging from 10 micrometers," would actually mean a particle expressed as an equivalent sphere ranging from 10 um.

31.     Equivalent sphere diameter is widely used given its practicality, however, each method of sizing gives rise to one or more options for the allocation of an equivalent sphere size to a specific particle.

32.    When measuring particle size the four common techniques used are: microscopy, laser diffraction, image analysis and sieving (although this is generally only used for very large particles), and these are each discussed below[4]. For each technique, the concept of equivalent sphere diameter is used, with each potentially providing a different value when measuring the same particle.

*Microscopy (Optical Counting)*

33.    Microscopy involves taking a random sample of particles, which in itself is not easy as it is a very small sample from a potentially very large batch, placing them on a microscope slide, sufficiently separated to be individually visualised, and ascribing a single measurement to each

---

[4] I take the patent specification which states "well-known method in the prior art such as sieve analysis, laser diffraction methods, photoanalysis or optical counting methods" to relate to sieve analysis, laser diffraction, image analysis and microscopy respectively.

particle.  Measurement is made using a small linear scale, called a graticule.  When looking through a microscope, a particle can be seen in 2-dimensions, e.g., some indication of length and width, but with no visualisation of height.  To the extent some particles lie in a different orientation to others then for some the measurement may be, for example length and height and others length and width.  One advantage of microscopy is that the particles are actually visualised, allowing particle shape to be noted and adequate dispersion (i.e., the absence of clumps of particles) to be confirmed.  Avoiding artefacts of aggregation (i.e. obtaining an overestimate of size by measuring aggregates rather than individual particles) , whilst not trivial with microscopy, is harder by other methods.

34.    When measuring by microscopy the operator must choose which dimension of the 2-dimensional image to measure and ascribe that size as the diameter of the equivalent sphere.  If only the longest dimension of each particle is used, particle size will be overestimated, and vice versa for the smallest dimension.  Although there are a number of methods for selecting the dimension to record in an attempt to generate more reliable results, there will always be some variation between different microscope operators and even between the same operator on different occasions.   Furthermore, the equivalent sphere diameter generated from microscopy will differ from that generated by other methods of size analysis for the same particle.

35.    When sizing with microscopy the number of particles in each selected size range is recorded.

*Image analysis (Photoanalysis)*

36.    Image analysis is an adaptation of microscopy, in which images of (hopefully) individual particles are captured by camera and analysed by software.  The software can usually be set to calculate one, or more, of a number of parameters to describe the particles, including

length, or the volume for each individual particle converting it into an equivalent sphere diameter. Image analysis can also yield a calculated number for surface area[5]. Image analysis requires the same separation of individual particles as microscopy, to avoid issues of aggregates being considered as single particles[6]. For image analysis it can be possible to record the number of particles in each size range, or the volume of particles in each size range. The difference between number and volume distributions is explained below.

*Sieving*

37.    Sieving typically involves a stack of sieves of decreasing mesh size from top, into which API powder is loaded, to bottom. The stack is shaken for a period of time (which should be stated as it can alter the result), following which the mass of powder in each sieve is weighed. The size range of particles on each sieve is deemed to be between the sizes of the holes in the mesh immediately above and below. The results are then plotted as the mass of powder within each size range, i.e., the mass of powder retained on each sieve. As a consequence of the physical action of the sieving process, it will tend to be the smaller dimensions of particles which are detected (i.e., the smaller dimension can fall through a mesh), tending to give a lower value than other methods of analysis. Equally, electrostatic charging caused by shaking particles in the sieve stack can cause particle aggregation in the sieves which would overestimate size. Sieving has the advantage of being capable of measuring a much larger volume of material than other methods, which makes sampling issues less of a concern.

---

[5] I discuss surface area below, but the surface area determined by image analysis will be different to that obtained by other methods on the same powder sample.

[6] The issue of aggregates is challenging and gives different results for different methods, for example it is necessary to break transient aggregates to measure the individual particles, but not desirable to break fragile morphologies that in fact are single particles. The stress that is selected to deaggregate a powder can be too little (aggregates remain), correct, or too much (particles are size reduced). The method itself is key here and must be specified in exact detail.

*Laser diffraction*

38.     Laser diffraction works by trying to take a random sample of particles, dispersing them at a suitable concentration in air or liquid, passing them through a beam of laser light and measuring the resulting diffraction.  This method is based on the phenomenon that when placed in a beam of light particles scatter that light in all directions, with particles of different sizes producing different scattering intensity patterns.  At any one time many particles will be hit by the light beam and the intensity pattern produced will be a composite of the individual particle patterns. Computer software analyses the composite intensity pattern to generate a particle size distribution for the sample.  As for microscopy and image analysis, obtaining a representative sample can be an issue.  It is not trivial to ensure a random sample of particles and harder still to be sure that they are dispersed as individual particles, without aggregates and without reducing the size of fragile particles.

39.     Laser diffraction suffers from problems in deaggregating loose agglomerates, and not breaking real particles.  The need to dispersion into either a liquid, with many choices such as no additional dispersion, stirring, ultrasonics, and/or surfactants, or air (with different pressure options and different disperser designs) will be likely to give different levels of aggregation and different size results.  The further complication when dispersed in liquid can be related to solubility into the liquid affecting results, but this should be resolved with suitable experimental technique. (see Malvern pages 15-16)

40.     Laser diffraction methods also yield a value for specific surface area (*see* the Malvern Users Manual March 2007, https://www.malvernpanalytical.com/en/assets/Mastersizer-2000-user-manual-English-MAN0384-1-0_tcm50-11674.pdf at 76 of 154).

41.     To summarise particle size analysis, microscopy measures an operator dependent dimension (for example the length) of the particle with the equivalent sphere diameter being a sphere with a diameter of the measured length; if a sieve is used to measure the particle size the equivalent sphere diameter is the diameter of a sphere passing through the same sieve aperture; if image analysis is used there are various options, including the length, the volume, or the surface area of the particle being measured (calculated) with the equivalent sphere diameter being the diameter of a sphere with the same length, volume or surface area (depending on how the experiment is set up) and; if laser diffraction is used then volume is measured with the equivalent sphere diameter being the diameter of a sphere having the same volume as the measured particle.

42.     The discrepancy between equivalent sphere diameter when using microscopy and laser diffraction is illustrated in Figure 1 below.



Figure 1.  Illustration of different equivalent sphere diameters for a single particle.  Using microscopy, any dimension may be selected by the operator (here 10μm and 2μm).  Using laser diffraction, the volume of the particle is first calculated (π x 1 x 10 = 31.42μm3), and a diameter reported of a sphere with this volume, in this case 3.9μm (as 31.42 = 4/3 x π x r3). Adapted from Rawles Figure 2.

43.     When measured by microscopy (for a cylinder with a width of 2μm and height of 10μm), the equivalent sphere diameter will be 10μm if the longest dimension is measured, 2μm if the shortest dimension is measured, or anywhere between these values if another dimension is measured.  In contrast, when measuring by laser diffraction, which reports the volume of particles, an equivalent sphere diameter in the region of 3.9μm is calculated.  Despite the significant discrepancy between the values reported by these two measurement techniques, each are perfectly reasonable ways of defining the equivalent sphere diameter for this particle.

44. This concept is demonstrated by a publication from Malvern (a major supplier of particle sizing analysis equipment), showing the different equivalent spheres that arise from different methods.



Illustration of the concept of equivalent spheres.

*Particle size distributions*

45. Having obtained one of many possible equivalent sphere sizes to describe the size of the measured particle, the data for many particles are then presented in a particle size distribution. For instance, for a population of particles measured by microscopy and laser diffraction the equivalent sphere diameter is plotted on the x-axis and the number (for microscopy) and volume (for laser diffraction) on the y-axis.

46. The rationale for number and volume distributions comes from the method of measurement, and also relates to desired use. For pharmaceuticals, assigning one very large particle to have the same significance as one very small particle maybe less desirable, because the large particle maybe the substantial amount of a given dose, whilst the small particle may be a

trivial contribution to the dose.  That said, a distribution can be by number or by volume, and there are possibilities to make conversions between the two for some methods of measurement.

47.    For the same sample, the shape of the distribution can be significantly affected depending on the technique used.  For example, the difference between a number and volume distribution for the same particle population (assuming the particles had been allocated the same equivalent sphere diameters) is illustrated below.



| Diameter (µm) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Volume (µm³) | 0.5 | 4.2 | 14.1 | 33.5 | 65.5 | 113.1 | 179.6 | 268.1 | 381.8 | 523.7 |

**Figure 2a.**  A simplistic particle distribution consisting of 10 particles between 1µm and 10µm.  Diameter and volume are show below each particle.



**Figure 2b.**  A number distribution of the particles shown in Figure 2a.



**Figure 2c.** A volume distribution of the particles shown in Figure 2a.

48.    Figure 2a presents a population of 10 particles, which are then plotted as a number and volume distribution.  In this simplified example, the Figure 2b distribution indicates one particle for each particle size as microscopy measures the number of particles that fall within each size.  If instead the volume of each particle is plotted as a fraction of the total volume, then the distribution reflects that there are several very large particles within the sample, with the majority of the total volume found in particles 8, 9 and 10 and only a fraction in particles 1, 2 and 3, as shown in Figure 2c.  Therefore, for a sample with a large proportion of the total volume found in relatively few particles this will only be reflected by a volume distribution.  (*see* Malvern at 7)

49.    It is possible to convert a number distribution to a volume distribution, however this must be done cautiously.  As each diameter is cubed, when converted to a volume distribution any errors are also effectively cubed.  Conversion from a volume distribution to a number distribution is also possible and is generally regarded as being less prone to error.  (*see* Rawles at 3)

50.    Most real-world particle populations contain thousands of particles and a number distribution for such a population can look like the distribution of Figure 3a below. Although a

normal distribution is shown here, distributions can, and do, take a variety of shapes depending on the population being measured.



**Figure 3a.** Histogram showing a number distribution of particle size.

For comparison, this same sample is plotted as a volume distribution in Figure 3b, below.



**Figure 3b.** Histogram showing a volume distribution of particle size.

51.    Such graphical representations provide information about the distribution of particle size, such as the upper and lower limits of the distribution, whether the distribution is normal, skewed or bimodal etc.

52.    It is usual to re-plot such distributions as a cumulative frequency plot showing the percent of particles (whether by number or volume) under a certain size on the y-axis, as shown in Figure 4 below.



**Figure 4.**  Cumulative frequency plot showing cumulative % undersize for number (blue line) and volume (green line) distributions using the same data set as used in Figure 3. Values for d90, d50 and d10 can be taken from the x-axis, as shown by the red dotted lines.

53.    When describing a particle distribution numerically (rather than graphically) it is usual to give a central point of the distribution, i.e., the median or "d50", plus values indicating the spread of the distribution, e.g., the "d10" and "d90".  The d50 is the size at which 50% of the particles (by number or volume) are smaller and 50% are larger.  This can easily be ascertained from the above cumulative frequency graph, as can the d90 and d10 values.  It is necessary to plot

the data as either a number or volume cumulative frequency distribution to determine the values for d10, d50 and d90.

54.    That the d10, d50 and d90 values can be different depending on the distribution is reflected by comparing the cumulative frequency plots for number (blue line) and volume (green line) in Figure 4.

55.    Therefore, when analysing or comparing particle size distributions it is important to understand; first, which technique was used to measure the equivalent sphere (for instance, microscopy measuring length or laser diffraction measuring volume), and second, on what basis the distribution has been calculated (for example, number distribution or volume distribution).

### C. The particle size claim terms.

56.    The terms "particle size," "the particles have a diameter less than," "having a diameter less than," and "has a diameter of," are all indefinite as a POSA has no guidance on the method of measurement of the particles.  The specifications of the patents-in-suit allow any method of size analysis, so any possible equivalent sphere.  It follows that "particle size" being any equivalent sphere from any 3-dimensional geometry is indefinite, as there is no guidance as to how to determine the suitable equivalent sphere.  Instead, the specification says that any of the known methods can be used, but, as described above, each can give a different measurement of the size of the same particle.  Likewise, "having a diameter less than," and "has a diameter of," both require a definition of an equivalent sphere, and any method of size analysis is allowed, so many equivalent spheres are possible, which can cover a wide range of values, as discussed above.  It is not possible to determine whether a sample of ANDA API would fall inside or outside of these claim terms for the reasons discussed above.

57.     The terms "d10 particle size," "d50 particle size," "d90 particle size," "the particles have a d50 of less than," "the particles have a d50 ranging from," and "the particle form has a d50 in the range of," are equally indefinite because the specifications do not describe how to determine an equivalent sphere (as for the terms in the paragraphs immediately above). There is a further issue here in that these terms are derived not only from an undefined method of ascribing an equivalent sphere, but also from either a number or a volume distribution. There is great variability in these terms based on selection of the equivalent sphere and the selection of the type of distribution. As such is not possible to determine whether a sample of ANDA API would fall inside or outside of these claim terms for the reasons discussed above. The variability between the different methods can be substantial; therefore for any API batch that is anywhere near a claim boundary, using one method of measurement may indicate a particle within the claimed range while another method of measurement of the same particle may result in the particle outside of the claims.

**D.  Surface area terms.**

58.     The terms "wherein the particles have surface area ranging from," "wherein the particles have surface area ranging from," "wherein the particle form has a specific surface area from," "surface area ranges from," and "surface area ranging from" are indefinite as there is no single method for determining the surface area.

59.     Surface area can be determined by gas adsorption, which is described as one option in the specification. The patentees have not limited themselves to a specific gas. They could have limited to "nitrogen BET" for example, but they generalised to "gas". Possible selections of gas include nitrogen, argon, krypton, and water vapour. As each gas has a different molecular size it can access different pores and regions of a powder, and therefore yield different results for surface

area. More significant differences will come from surface area determinations from particle size analysis. There is nothing in the specification to say that a specific surface area from image analysis, or from laser diffraction should not be used. The specification encourages the use of both these methods for size analysis, so a POSA would be in possession of specific surface area results from such size analysis. There would be no reason not to use these data to apply to the claim term. As for sizing, image analysis and laser diffraction use totally different equivalent spheres to define the same particle. It is these equivalent sphere sizes that are used to calculate the specific surface area of the particle (the surface area of a[n equivalent] sphere is $4 \pi r^2$).

60.    As such it is not possible to determine whether a sample of ANDA API would fall inside or outside of these specific surface area claim terms for the reasons discussed above.

I declare under penalty of perjury the foregoing is true and correct.

Executed this __14__ day of December, 2022.

_____
Graham Buckton, Ph.D.