# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

EXELTIS USA, INC.,
LABORATORIOS LEON FARMA, S.A.,
CHEMO IBERICA, S.A., and
CHEMO RESEARCH, S.L.

        Plaintiffs,

   v.

LUPIN LTD. and LUPIN
PHARMACEUTICALS, INC.,

        Defendants.

C.A. No. 22-434-RGA

## DEFENDANTS' OPENING POST-TRIAL BRIEF ON INVALIDITY

*Of Counsel:*

Michael Nutter
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818

Merritt Westcott
MCGUIREWOODS LLP
845 Texas Ave., 24th Floor
Houston, TX 77002-2904

Corinne S. Hockton
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601-3071

Daniel Withers
MCGUIREWOODS LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201-2648
dwithers@mcguirewoods.com

Dennis D. Gregory
MCGUIREWOODS LLP
300 Colorado Street, Suite 2300
Austin, TX 78701-3925

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS McLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806-4204
Telephone: (302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

*Attorneys for Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

Dated: March 29, 2024

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.     ALL ASSERTED CLAIMS ARE INVALID AS INDEFINITE ....................... 3

        A.      The Dissolution Limitation Is Indefinite.............................................. 5

                1.      The Dissolution Limitation Allows for A Multitude of Testing
                        Parameters Yielding Substantively Different Results................................ 5

                2.      There is No "Single Known Approach" to the Claimed Dissolution
                        Testing, and the Patents' Parameters Would Not Have Been
                        Selected by a POSA for All Formulations Falling Within the Scope
                        of the Claims ............................................................................................. 7

                3.      It is Undisputed that Varying The Testing Parameters Causes
                        Substantively Differing Dissolution Results, Falling Either Inside
                        or Outside the Claims.............................................................................. 13

        B.      The Particle Size and Particle Size Distribution Limitations are Indefinite ......... 13

III.    CLEAR AND CONVINCING EVIDENCE SHOWED THAT EACH
        ASSERTED CLAIM WOULD HAVE BEEN OBVIOUS TO A POSA........................ 17

        A.      The Art Did Not Teach Away from "Slow Release" of DRSP ............................ 17

                1.      *Bayer Schering v. Barr* Forecloses Teaching Away Because Fast
                        Release Was Merely One Option................................................................ 18

                2.      Huempel Taught that Loss of Bioavailability Did Not Occur While
                        Teaching Towards Slow Release ................................................................ 19

        B.      The Asserted Claims Are Invalid as Obvious Over Huempel and Davila............ 20

        C.      A POSA Would Have Been Motivated to Make DRSP Tablets, Free of
                Estrogen, in the Claimed Dosage Ranges ............................................................ 21

        D.      A POSA Would Have Been Motivated to Develop a Product with the
                Claimed Pharmacokinetics.................................................................................. 22

        E.      A POSA Would Have Been Motivated to Use the Claimed Particle Sizes
                to Achieve the Claimed Pharmacokinetics and Obtain the Claimed
                Dissolution Profile ............................................................................................. 25

        F.      A POSA Would Have Been Motivated to Use 24/4 Dosing ............................... 26

IV.     THE ASSERTED CLAIMS OF THE '122 PATENT AND THE '249 PATENT,
        HAVING NO PARTICLE SIZE LIMITATIONS, ARE INVALID FOR LACK
        OF WRITTEN DESCRIPTION .......................................................................... 27

V.      CONCLUSION............................................................................................... 31

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Acorda Therapeutics, Inc. v. Roxane Labs, Inc.*,
    903 F.3d 1310 (Fed. Cir. 2018)............................................................24, 25, 26

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*,
    949 F.3d 1366 (Fed. Cir. 2020)....................................................................17

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012)....................................................................23

*Ariad Pharms, Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) ............................27, 28, 29, 30

*Bayer Pharma AG v. Watson Lab'ys, Inc.*,
    874 F.3d 1316 (Fed. Cir. 2017)..............................................................17, 18

*Bayer Schering Pharma AG v. Barr Lab'ys, Inc.*
    575 F.3d 1341 (Fed. Cir. 2009)........................3, 10, 11, 18, 19, 20, 21

*Dow Chemical Co. v. Nova Chemicals Corp.*
    803 F.3d 620 (Fed. Cir. 2015)...............................................................4, 7, 9

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
    904 F.3d 996 (Fed. Cir. 2018)....................................................................23

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009).................................................................6, 8

*Genentech, Inc. v. Hospira, Inc.*,
    946 F.3d 1333 (Fed. Cir. 2020)....................................................................23

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004)....................................................................23

*Kimberly-Clark Corp. v. Johnson & Johnson*,
    745 F.2d 1437 (Fed. Cir. 1984)....................................................................18

*Kyowa Hakka Bio, Co., Ltd. v. Ajinomoto Co.*,
    No. CV 17-313, 2020 WL 3403207 (D. Del. June 19, 2020).................15

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
    541 F. Supp. 3d 435 (D. Del. June 1, 2021) .................................................30

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..................................................................................................3, 13

*Noven Pharms., Inc. v. Amneal Pharms., LLC*,
    No. CV 18-699-LPS, 2020 WL 11191445 (D. Del. Sept. 4, 2020)........................................29

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*,
    151 F. Supp. 3d 525 (D.N.J. 2015) ...................................................................................14, 15

*In re Packard*,
    751 F.3d 1307 (Fed. Cir. 2014)..............................................................................................4

*In re Peterson*,
    315 F.3d 1325 (Fed. Cir. 2003).............................................................................................23

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997)........................................................................................28, 30

*Rivera v. Int'l Trade Comm'n*,
    857 F.3d 1315 (Fed. Cir. 2017).............................................................................................31

*Rothman v. Target Corp.*,
    556 F.3d 1310 (Fed. Cir. 2009).......................................................................................21, 22

*Teva Pharm. USA, Inc. v. Sandoz, Inc.* (post-*Nautilus*)
    789 F.3d 1335 (Fed. Cir. 2015)..........................................................................................4, 5

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
    642 F.3d 1370 (Fed. Cir. 2011).............................................................................................23

*UCB, Inc. v. Actavis Lab'ys UT, Inc.*,
    65 F.4th 679 (Fed. Cir. 2023) ...............................................................................................18

*Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*,
    955 F.3d 25 (Fed. Cir. 2020)................................................................................................24

**Federal Statutes**

35 U.S.C. § 112(b) ..................................................................................................................3

**TABLE OF ABBREVIATIONS**

| Abbreviation | Exhibit Number or Definition |
| --- | --- |
| '299 patent | U.S. Patent No. 11,123,299 |
| '632 patent | U.S. Patent No. 11,291,632 |
| '122 patent | U.S. Patent No. 11,351,122 |
| '249 patent | U.S. Patent No. 11,413,249 |
| '487 patent | U.S. Patent No. 11,478,487 |
| 24/4 dosing | 28-day treatment cycle consisting of 24 days of active followed by 4 days of placebo (or no therapy) |
| asserted patents | The '299, '632, '122, '249, and '487 patents |
| asserted claims | Claim 14 of the '299 patent, claims 12 and 21 of the '632 patent, claim 29 of the '122 patent, claim 7 of the '249 patent, and claim 19 of the '487 patent |
| AUC | Area under the curve |
| AUC0h-tlast | Area under the curve from initial administration to last measured time |
| $C_{max}$ | Maximum concentration of active pharmaceutical ingredient absorbed |
| COC | Combined oral contraceptive |
| Davila | U.S. Patent No. 8,475,838 (DTX-049) |
| DRSP | Drospirenone or 6β,7β:15β,16β-Dimethylene-3-oxo-17α-pregn-4-ene-21,17-carbolactone |
| Elger | W. Elger et al., *Conception and pharmacodynamic profile of drospirenone*, 68 STEROIDS 891 (2003) (DTX-051) |
| Funke | U.S. Patent Publication No. 2005/0220825 (DTX-353) |
| Half-life or t ½ | Time over which one half of the active pharmaceutical ingredient degrades |
| Heil 076 | E.U. Patent No. 1214076 (DTX-426) |
| Heil 892 | E.U. Patent No. 1611892 (DTX-139) |
| Helm | WIPO Publication No. 2009/138224 (PTX-562) |
| Hilman | U.S. Patent Publication No. 2003/0114429 (DTX-115) |
| Huempel | WIPO Publication No. 2008/031631 (DTX-054) |
| LPFF | Lupin's Proposed Findings of Fact |
| Lupin | Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc. |
| Lupin's Product | Lupin's Proposed ANDA Product |
| Plaintiffs | Plaintiffs Exeltis USA, Inc., Laboratorios Leon Farma, S.A., Chemo Iberica, S.A., and Chemo Research, S.L. |
| POP | Progestin only pill |
| POSA | Person of Ordinary Skill in the Art |
| Rawle | Alan Rawle, Malvern Instruments Limited, *Basic Principles of Particle Size Analysis* (DTX-153) |
| Sandrone | WIPO Publication No. 2006/015956 (DTX-374) |
| Schering | Bayer-Schering or a related company |
| Schering references | Funke, Heil 076, Heil 892, and Hilman, collectively |
| $T_{max}$ | Time to maximum concentration of absorption |
| Tr. | Trial transcript |
| WO 199 | WIPO Publication No. 2005/087199 (DTX-019 at SLYND_0009081–9100) |

## I.    INTRODUCTION

The six claims asserted at trial are simple, non-technical design-arounds of prior art patent coverage. They are primarily directed to *functional* outcomes of a pharmaceutical composition and not the composition of the formulations. DRSP was well known in the art, and Schering's patent covering the compound had expired long before the priority date. Schering later obtained patents to micronized DRSP formulations that dissolved quickly *in vitro* (>70% in 30 minutes) and that produced the rapid *in vivo* pharmacokinetics of its successful Yaz® and Yasmin® products. Thus, the only potentially innovative aspect of Plaintiffs' later claims was to exploit holes in the prior art patent coverage left by Schering. To avoid Schering's patents, Plaintiffs claimed DRSP formulations with a slower *in vitro* release (<50% in 30 minutes) using DRSP with a slightly larger particle size distribution that correspondingly—and predictably—produced slower *in vivo* pharmacokinetics. LPFF ¶ 78.

Plaintiffs' earlier-issued, related patents included particle size distribution limitations. After receiving Lupin's February 2022 Paragraph IV notice letter, which stated that Lupin's Product did not contain DRSP of the claimed particle sizes, Plaintiffs quickly filed multiple additional continuation patent applications without particle size distribution limitations. Thus, some of the asserted claims have particle size distribution limitations, and some do not.

All asserted claims, however, require that the pharmaceutical composition be "formulated such that … no more than 50% of [DRSP] initially present in the pharmaceutical composition is dissolved within 30 minutes if subjected to an in vitro dissolution test according to the USP XXIII Paddle Method." This functional dissolution limitation is indefinite under the Court's claim construction because no specific set of testing parameters is required (D.I. 298 at 5–7) and, on the facts, varying the testing parameters produces substantively different results such that a formulation may be inside or outside the claims depending on the parameters selected. To avoid

1

the consequences of claim construction, Plaintiffs want the Court to do *de facto* what it already has refused to do *de jure*: read in parameters described in a non-limiting example. At trial, Plaintiffs made the same arguments they advanced during claim construction for why a POSA would purportedly use *only* the testing parameters of that non-limiting example. The file history, however, demonstrates that multiple testing parameters existed in the prior art for use with DRSP, and furthermore, a POSA would not use the example's parameters across the broad scope of formulations claimed—particularly formulations with dosages above about 3 mg or with a significantly different composition like Lupin's Product. In these cases, the example's parameters will not provide meaningful results. Because different parameters may be used, and yield substantively different results, the dissolution limitation of the asserted claims renders the claims invalid as indefinite.

The particle size/particle size distribution limitations of the asserted claims of the '299, '632, and '487 patents are likewise indefinite. As construed by the Court, the claims allow any method of measurement. Particle size and distribution can be determined in many different ways, and the specification explicitly recites a number of methods, each of which produces valid yet different results. A POSA would not know which method to use, and the specification fails to provide adequate guidance. Thus, a potential infringer could not know whether it was inside or outside the claims' scope. These asserted claims are invalid as indefinite for this additional reason.

All asserted claims also are invalid as obvious. Plaintiffs argued that their design-arounds were non-obvious because, in the inventors' view, the Schering references taught away from slower dissolution by teaching that faster dissolution leads to higher bioavailability. But these self-serving positions were false; the art as a whole did not teach away. In fact, the Federal Circuit rejected essentially the same argument in 2009 (before the priority date) when it invalidated as

obvious a Schering patent directed toward rapidly releasing DRSP formulations in *Bayer Schering Pharma AG v. Barr Lab'ys, Inc*. 575 F.3d 1341 (Fed. Cir. 2009). Schering took exactly the opposite position Plaintiffs take here: that the prior art did not teach away from a *rapid* release due to concern about degradation in the stomach. The court rejected that position because the art proposed a release-delaying enteric coating as an alternative. Regardless, Huempel taught that Schering's *in vivo* bioavailability concerns were illusory and disclosed DRSP-containing formulations with a much slower release and delayed pharmacokinetics. Plaintiffs' claims fall in the obvious middle between what is disclosed in the Schering patents and their own prior work in Davila, on the one hand, and in Huempel on the other.

Finally, the asserted claims of the '122 and '249 patents are invalid for lack of adequate written description. These claims, prosecuted by Plaintiffs only after they received Lupin's Paragraph IV notice letter, abandoned the particle size limitations to claim almost *any formulation* resulting in the recited functional dissolution and pharmacokinetic limitations. Yet the teachings in the specification are fairly directed <u>only</u> to formulations where the claimed functional limitations are achieved by moderating the particle size of DRSP. A POSA reading the patent would not recognize that Plaintiffs possessed the full scope of these broad functional claims, and certainly would not recognize from the specification that the inventors possessed a formulation like Lupin's Product. Because the specification does not contain adequate written description across the scope of the broad claims, the asserted claims of the '122 and '249 patents are invalid.

## II.    ALL ASSERTED CLAIMS ARE INVALID AS INDEFINITE

Patent claims are indefinite if they fail to "particularly point[] out and distinctly claim[] the subject matter" of the invention. 35 U.S.C. §112(b). The "claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910

(2014). "As the statutory language of 'particular[ity]' and 'distinct[ness]' indicates, claims are required to be cast in clear—as opposed to ambiguous, vague, indefinite—terms. It is the claims that notify the public of what is within the protections of the patent, and what is not." *In re Packard,* 751 F.3d 1307, 1313 (Fed. Cir. 2014).

Here, the claims require a specific dissolution rate (and in some claims, also a specific DRSP particle size), but do not recite specific methods of analysis for either. In *Teva Pharm. USA, Inc. v. Sandoz, Inc.* (post-*Nautilus*), the Federal Circuit held that a claim is indefinite when it recites a measured property, and the intrinsic evidence does not convey with reasonable certainty how to measure that property. 789 F.3d 1335, 1337–38 (Fed. Cir. 2015). The *Teva* claims related to a polymer "having a molecular weight of about 5 to 9 kilodaltons." *Id.* at 1338 (emphasis removed). The specification did not define "molecular weight," three different measures existed, and the claim language did not indicate which to use. *Id*. at 1344. Each method of measurement was calculated in a different manner and resulted in different values. *Id.* at 1338. The patentee claimed that the specification pointed to the use of only one of the three methods. *Id*. at 1341. However, the file histories of related patents pointed to the other methods. *Id*. at 1343–44. The court determined that even if a POSA accepted that the specification was directed to one method, a POSA would "still not be reasonably certain in light of the entire [intrinsic] record." *Id*. at 1345. The intrinsic evidence as a whole did not convey to a POSA which method to use with reasonable certainty, and thus the claims were indefinite *Id.* at 1344–45.

Likewise, in *Dow Chemical Co. v. Nova Chemicals Corp.*, the Federal Circuit held that claims reciting "a slope of strain hardening coefficient greater than or equal to 1.3" were indefinite. 803 F.3d 620, 624–25 (Fed. Cir. 2015). The specification provided an equation to calculate "slope of strain hardening coefficient," but the claims were found indefinite because the patent "fail[ed]

to teach with reasonable certainty where and how the 'slope of strain hardening' should be measured." *Id.* at 633. Experts identified four different possible measurement methods, but the intrinsic evidence did not discuss those methods or "provide[] any guidance as to which method should be used, or even whether the possible universe of methods is limited to these four methods." *Id.* at 634. The court noted that to avoid indefiniteness, "the patent and prosecution history must disclose a single known approach or establish that, where multiple approaches exist, a person having ordinary skill in the art would know which approach to select." *Id.* at 630 (citing *Teva* at 1344–45). The issue in *Dow* was therefore "whether the existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite." *Id.* at 634.

Discussing the factual similarities to its recent *Teva* decision, the Federal Circuit noted that in *Teva*, it reviewed the patent and file history "to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed[,]" but that "[n]either the claims nor the specification contained an explicit definition" of the disputed claim term, and the prosecution history was inconsistent with the specification. *Id.* at 634–35. Further, it noted that it found the claims in both cases indefinite "even though the patentee's expert . . . testified that someone skilled in the art could determine which method was the most appropriate." *Id.* at 635. As explained below, the asserted claims containing dissolution and particle size limitations here are indefinite for the same reasons as the Federal Circuit found in *Teva* and *Dow*.

### A.     The Dissolution Limitation Is Indefinite

#### 1.     The Dissolution Limitation Allows for A Multitude of Testing Parameters Yielding Substantively Different Results

The Court recently held that "USP XXIII Paddle Method" has its plain and ordinary meaning and rejected Plaintiffs' request to read-in specific, unclaimed testing parameters from the

specification of the patent. D.I. 298 at 5–7. Plaintiffs argued that: 1) a POSA would understand that the specification sets forth the only parameters to be used with the claimed Paddle Method, 2) these parameters are the only ones in the specification, and 3) the file history confirms this understanding, because Dr. Blatnik used these parameters in her testing and distinguished a prior art method that used acidic dissolution media. D.I. 287 at 1–2.

The Court considered and rejected all of these arguments and declined to limit "USP XXIII Paddle Method" to any particular testing parameters. *See* D.I. 298 at 6 ("I am unpersuaded by Plaintiffs' argument that the claims require specific test conditions. The plain language of the claims does not indicate that the Paddle Method must be performed under any conditions."). The Court further concluded that the specification did not define "Paddle Method," and Plaintiffs had not disavowed other testing parameters because "neither the specification, nor the file history constitute[d] 'unmistakable' evidence of disclaimer," and "[o]ther references to the Paddle Method in the specification and file history are similarly insufficient to limit the claim scope to only one set of conditions." *Id*. at 7. The Court held that "Plaintiffs' proposed construction would import limitations into the claims" and "contradict the claims' plain language." *Id*. Thus, the claims are not limited to any particular media, volume, temperature, or stirring speed. The testimony Plaintiffs elicited at trial ignored the Court's construction and was an exact retread of the very arguments the Court rejected. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial."). The Court should reject Plaintiffs' positions at trial as directly inconsistent with its claim construction order.

> **2.** **There is No "Single Known Approach" to the Claimed Dissolution Testing, and the Patents' Parameters Would Not Have Been Selected by a POSA for All Formulations Falling Within the Scope of the Claims**

Plaintiffs seemingly seek to side-step the Court's claim construction, presenting the same facts to convince the Court to read into the claims the very parameters it previously refused: (1) 900 mL (volume) of (2) water (media) at (3) a paddle speed of 50 rpm and (4) a temperature of 37±.05°C. Even if one were to set aside the Court's claim construction, the asserted claims are invalid as indefinite under *Dow*'s two prong test.

The claims do not meet *Dow*'s first prong because the specification and prosecution history do not disclose a "single known approach" to dissolution testing for DRSP according to the USP XXIII Paddle Method. *Dow, 803 F.3d* at 630. The specification does not redefine the term and the example is not limiting, as the Court previously determined. D.I. 298 at 6–7. In fact, the specification explicitly states that "[t]he in vitro dissolution rate of any active drug of the present invention, including drospirenone, may be assessed by anyone of the well -known methods described in the prior art," and that "[t]he following examples are illustrative and not intended to limit the scope of the invention as claimed." LPFF ¶ 42.

And it is clear from the prior art cited in the common file history that there is not a single set of testing parameters for DRSP. Different types of media, temperatures, volumes, and stirring speeds were used in the intrinsic prior art for determining DRSP dissolution rate with the USP Paddle Method. The chart below summarizes the intrinsic prior art conditions, and notes whether the reference is assigned to Schering. Differences from Plaintiffs' proposed parameters are bolded.

| Reference | Media | Volume (ml) | Temperature (°C) | Speed (rpm) | Schering |
|---|---|---|---|---|---|
| Heil 076 Heil 892 Hilman | $H_2O$ | 900 | $37 \pm 0.5$ | 50 | Yes |
| Funke | $H_2O$ | 900 | $37 \pm 0.5$ | 50–**100, including 75** | Yes |
| Davila | $H_2O$ | 900 | $37 \pm 0.5$ | 50 | No |
| Helm | $H_2O$ or **HCl** | 900 | **$39 \pm 0.5$** | **100** | No |
| Sandrone | $H_2O$ or **HCL with 0.7% sodium lauryl sulphate** | 900 | $37 \pm 0.5$ | 50 | No |
| WO 199 | $H_2O$ or solution of **sodium dodecyl sulfate or other aqueous media** | 900–**1000** | 37 | 50 or **100** | Yes |

LPFF ¶¶ 52, 54.

Moreover, during prosecution, the examiner rejected a claim requiring testing according to the USP XXIII Paddle Method as anticipated by Helm. LPFF ¶ 12–13. Helm did not use the parameters Plaintiffs seek to read into the claims, but used different media, temperature, and stirring speed (see above chart). Yet, rather than distinguish Helm as failing to disclose testing according to the "USP XXIII Paddle Method" as claimed, Plaintiffs overcame the rejection by amendment, adding an unrelated claim limitation. *Id*. Further, Plaintiffs' repeated argument that their distinguishment of Sandrone (via the Blatnik declaration), which disclosed acidic media, somehow limited the claims to only the four testing parameters in the specification overextends their statements made during prosecution. First, only acidic media was distinguished, not all other media or any of the other three parameters. LPFF ¶¶ 14–17. Second, the Court has already determined that these statements in the Blatnik declaration were not a disclaimer of claim scope. D.I. 298 at 7.

And though Plaintiffs' expert, Dr. Koleng, testified that a POSA would use the parameters in the specification because selected prior art patents (shown in PDX6-17) "overwhelmingly" used

water (Tr. at 720:22-721:2), he neglected to mention that these patents also included different temperatures (Helm) and paddle speeds (Helm and Funke). LPFF ¶ 52. He also ignored other intrinsic prior art that did not support his position, such as WO 199 (using other media, volumes, and stirring speeds) and Huempel, which the inventors expressly reference and discuss in the specification (using other media and a surfactant). LPFF ¶¶ 52–53. Thus, Dr. Koleng's affirmative representation to the Court that "every place where there's any discussion of testing or any discussion relevant to this topic at all in the prosecution history…[the conditions of the patent] are used…" was incorrect. Tr. at 780:4–17. Dr. Koleng did not give the Court the full view of the intrinsic record. The specification and file history did not show a "single known approach" under the first prong of *Dow*. Quite the contrary, the intrinsic record discloses various approaches using different media, stirring speeds, temperatures, and volumes.

If there is no "single known approach," the second prong of *Dow* considers whether a POSA "would know which approach to select" where multiple approaches are known. *Dow*, 803 F.3d at 630. There is no legitimate dispute that the function of the dissolution test is to establish a correlation between a formulation's *in vitro* dissolution behavior and its *in vivo* pharmacokinetic behavior (an "IVIVC"). This specification makes this clear, stating:

> the present invention shows that the *in vitro* dissolution rate of DRSP is correlated to its pharmacokinetic profile *in vivo*. A composition displaying a pharmacokinetic profile for DRSP as fully-described above may exhibit a slow *in vitro* dissolution rate of DRSP such that no more than 50% of DRSP initially present in the said composition is dissolved within 30 minutes.

JTX-004 at 19:32–39; LPFF ¶ 45. The file history indicates the same. LPFF ¶ 45. Plaintiffs' later protestations notwithstanding, they boasted during opening statements and through inventor testimony that the goal of the claimed invention was to achieve slower *in vivo* absorption of DRSP by making a formulation with slowed *in vitro* dissolution. *See* Tr. at 17:15-22 (Plaintiffs' Opening), 468:18-469:1 (Velada), 492:14-493:2 (Perrin). And, of course, Schering had previously disclosed

9

such a correlation, tying a fast *in vitro* dissolution rate to fast *in vivo* pharmacokinetics. LPFF ¶ 55. And in *Bayer v. Barr*, the Federal Circuit affirmed the district court's conclusion that the POSA "would not accept *in vitro* testing as valid without a correlation to *in vivo* tests." 575 F.3d at 1348.

In view of the IVIVC function of the dissolution test and the non-liming nature of the specification, a POSA would understand that the specification's example parameters are not a one-size-fits-all solution to all formulations falling within the claims' broad, functional scope. In selecting parameters, a POSA therefore would consider "the drug in the formulation, the solubility of the drug in the dissolution fluid … [and] the characteristics of th[e] formulation." LPFF ¶ 44.

One important aspect of a dissolution test is whether it meets "sink conditions." LPFF ¶¶ 44–51. Sufficient dissolution media must be present to ensure that dissolution is not slowed as the amount of dissolved active ingredient increases. LPFF ¶ 48. As a BCS Class II drug, DRSP rapidly permeates into the body *in vivo* and therefore does not accumulate in the gastrointestinal fluids. LPFF ¶¶ 31, 106, 108. For example, Huempel and WO 199 discuss the importance of meeting sink conditions for drospirenone. Huempel explicitly states that hydroxypropyl-B-cyclodextrine was added to phosphate buffered media to achieve sink conditions. LPFF ¶ 51. WO 199 also directs the use of a "dissolution medium that ensures sink condition such as water or an aqueous solution of sodium dodecyl sulfate" to investigate the dissolution rate of DRSP formulations. *Id.*

Turing to the other prior art, the DRSP formulations that were subject to dissolution testing in Heil 076, Hilman, Davila, Funke, Sandrone, and Helm contained only 3 mg of DRSP and used a test designed for formulations with that dosage. LPFF ¶¶ 52, 54. For example, Heil 076 states:

> "rapid dissolution" is defined as the dissolution of at least **70% over about 30 minutes** … of DRSP prepared from **a tablet containing 3 mg of DRSP** in a 900 ml of water at 37C determined by the USP XXIII Paddle Method using USP dissolution test apparatus at 2 at 50 rpm.

LPFF ¶ 54.

10

Sink conditions are met for 3 mg of DRSP using 900 mL of water. LPFF ¶ 55. But the claims of the asserted patents are not limited to 3 (or even 4) mg dosage forms and include dosages up to 6 mg. *Id*. Sink conditions are not met in water for a dose of much more than 3 mg. *Id*., *id*. ¶ 60. And one cannot solve that problem by simply adding more water to the vessel as the dosage increases. LPFF ¶ 60. The Paddle Method apparatus only holds up to 1000 mL of media. *Id*. Thus, if one cannot achieve sink conditions in 1000 mL of water, a change in media to enhance the solubility of the drug product is required, such as by adding a surfactant. *See id.* ¶¶ 60–61. A POSA would know this, and this modification is explicitly suggested in the prior art FDA Guidance, particularly for water insoluble or sparingly water-soluble drug products (like DRSP). LPFF ¶ 61. Indeed, Plaintiffs' failure to obtain sink conditions with their 4 mg dosage form is why the FDA required Plaintiffs to add a surfactant to their dissolution media. LPFF ¶ 62. Plaintiffs' inventors testified that the dissolution parameters in the patent had been utilized for a 3 mg dose of DRSP, because they were the parameters Plaintiffs previously used when developing 3 mg generic versions of Yasmin® and Yaz®. LPFF ¶ 55. A POSA reading the patent and knowing how to perform an appropriate dissolution test would understand that the patent's parameters, used to test narrow example formulations, could not be extended for use with all claimed doses. LPFF ¶¶ 56, 60.

Setting aside sink conditions, a POSA would also know that certain formulation modifications may require a change in testing parameters. LPFF ¶¶ 56–60. For example, while both Plaintiffs' and Lupin's products have similar pharmacokinetic profiles and contraceptive efficacy, they are made differently and behave *very* differently when Plaintiffs' proposed dissolution parameters are used. LPFF ¶¶ 58–60. This is because, as all agreed, Lupin's Product contains a pH-dependent polymer coating that does not dissolve in water. LPFF ¶ 60.

Consequently, only a tiny fraction of the DRSP in Lupin's product dissolves in water over a biologically relevant time period. LPFF ¶ 57. Thus, a POSA understanding the specific formulation of Lupin's Product (or similar formulations designed to dissolve only under certain conditions) would not select the testing parameters in the patent, as they would provide no useful information related to, e.g., IVIVC.

Thus, a POSA would not have blindly used Plaintiffs' proposed "one-size-fits-all" parameters for every formulation within the scope of the asserted claims. These testing parameters fail to provide sink conditions for over half of the 2–6 mg dosage range claimed in the asserted patents and do not account for the many varied formulation types falling within the broad claims. LPFF ¶ 56. Plaintiffs' rigid adherence to only the parameters in the specification asks a POSA to ignore these facts, and to conduct a dissolution test that fails to meet simple scientific standards and that provides no useful information to the scientist.

In this way, the facts here are unlike those of *Teva* or *Dow*. In both of those cases, there was no indication that any of the potential methods of analysis or measurement were unsuitable to apply across the scope for the claims. In *Teva*, the specification's method for determining molecular weight worked across the scope of the claims. The same is true for *Dow*, in which there were three ways to measure slope. All possible methods would work, the question was simply which method to use. Here, however, there is ample evidence that the specification's parameters, used for testing a very narrow range of example formulations, are not suitable across the broad scope of the claims of the asserted patents. Unlike *Teva* and *Dow*, a POSA here would recognize that the parameters in the specification are not usable because they ignore the need for a suitable test – one that provides in vitro/in vivo correlation, the very purpose of the dissolution testing. Thus, a POSA would understand that not one set of test parameters could be used and would not

consider the specification's parameters to be usable or appropriate for the invention as broadly claimed.

> **3.    It is Undisputed that Varying The Testing Parameters Causes Substantively Differing Dissolution Results, Falling Either Inside or Outside the Claims**

Undisputed evidence showed that using different testing parameters with the USP XXIII Paddle Method produces significantly different results, and that Lupin's Product falls inside or outside the claims depending on the parameters used. LPFF ¶¶ 63–67. As just one example, even a minor change in paddle speed from 50 to 75 rpm was enough to change the dissolution of Lupin's Product in 30 minutes from 15% to 89%. LPFF ¶ 66. Thus, it is impossible for a competitor to know whether its product would fall inside or outside the claims. The claims allow for multiple testing parameters, which lead to substantively different results, and therefore "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. The claims are invalid as indefinite.

> **B.    The Particle Size and Particle Size Distribution Limitations are Indefinite**

Lupin proved by clear and convincing evidence that the asserted claims of the '299, '632, and '487 patents containing a particle size or particle size distribution limitation ("median particle size," $d_{10}$ and $d_{90}$ particle size) are indefinite because (1) the claims are not limited to a volume-based measure, and (2) different methods of determining particle size produce different results such that a product may be inside or outside the claims depending on the method of measurement (and parameters chosen for use with that method).

Here again, Plaintiffs largely seek a redo of claim construction, but are stuck between a rock and a hard place. First, Plaintiffs cannot dispute that the claims do not set forth any particular method of particle size measurement, and that the specification states that any well-known method could be used. JTX-004 at 22:46–50 ("particle size distribution….may be determined by well-

known methods of the prior art such as sieve analysis, laser diffraction methods, photoanalysis or optical counting methods."). Nor can Plaintiffs take the position that all methods recited in the patent are volume-based measurements (they are not). LPFF ¶¶ 68, 73.

Nevertheless, Plaintiffs have twice requested (unsuccessfully) that the Court read a volume-based limitation into the claims. D.I. 82 at 41–43, 47–50; D.I. 287 at 2–4. Plaintiffs now ask the Court a third time to change its construction because, in their view: (1) a POSA would know that laser diffraction (as used in the patents' examples) typically produces a volume-based measure, and (2) the pharmaceutical arts typically use a volume-based distribution.[1] Plaintiffs' approach should again be rejected outright as inconsistent with both the patents' express disclosure of multiple methods of particle size determination (some of which **cannot** be volume-based (LPFF ¶ 73)) and with the Court's claim construction. Thus, similar to *Teva*, the claims allow for a variety of measurement methods that yield substantively different results and are therefore invalid as indefinite. LPFF ¶¶ 68–74.

Post-*Nautilus* district court cases have held terms of measurement like "median particle size" are indefinite. For example, in *Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, the district court held on claim construction that "median particle size" was indefinite. 151 F. Supp. 3d 525, 549 (D.N.J. 2015). Otsuka, like Plaintiffs here, argued that the patent-in-suit revealed that "mean particle size" as recited in the independent claims referred to "volume mean particle size." *Id.* at 544. The court explained: "Otsuka points to a narrow portion of the specification that identifies a laser diffraction particle size analyzer, and then to asserted dependent claims 15 and 16, both of which contain the limitation that the 'mean particle size [be] measured using a laser diffraction

---

[1] Plaintiffs do not ask the Court to limit the *method* to laser diffraction, presumably because they could not use laser diffraction to analyze Lupin's formulated tablets for infringement.

14

particle size analyzer.'" *Id.* at 546. Otsuka argued that a POSA would, based upon industry literature, understand the claimed reference to "particle size analysis via laser diffraction methods" as an instruction to construe "mean particle size" as "volume mean particle size." *Id.* The *Otsuka* court rejected these arguments and held that "median particle size" was indefinite by analogy to *Teva* and *Dow*. *Id.* Multiple methods existed to determine median particle size and the specification did not lead a POSA to specific method. *Id.* at 548–49. *Otsuka* was affirmed by the Federal Circuit without opinion. A 2020 case from this district also reached a similar conclusion. *Kyowa Hakka Bio, Co., Ltd. v. Ajinomoto Co.*, No. CV 17-313, 2020 WL 3403207, at *6–7 (D. Del. June 19, 2020) (Goldberg, J.) (finding "average particle size" indefinite where there were multiple ways to measure particles, and the specification and prosecution history offered conflicting guidance as to the proper measurement technique).

Indefiniteness is clearer here than in *Otsuka*. There, the specification *only* disclosed laser diffraction. *Otsuka*, 151 F. Supp. 3d at 546–47. Here, the specification expressly states that *any* conventional method of particle size determination may be used and lists four representative techniques. It is undisputed that some of these methods are volume-based (laser diffraction) while others are number-based (optical counting) or weight-based (sieve analysis). LPFF ¶¶ 68, 73.

As Dr. Buckton explained, because drug particles are irregular, each measurement technique involves a separate methodology and measures different aspects of a given particle. LPFF ¶¶ 69–72. In a manner analogous to the "molecular weight" term in *Teva v. Sandoz*, "particle size" is treated as an equivalent sphere based on a user-selected parameter, such as maximum length, minimum length, surface area, or volume. *Id.* In short, "each method can give rise to a different equivalent sphere for that same irregular particle." Tr. 317:3–5; 319:16–320:3 (Buckton). Rawle confirms that particle size and distribution determinations are method-specific; a POSA

"can only seriously compare measurements on a powder by using the same technique." LPPF ¶ 72. When confronted with this statement on cross-examination, Dr. Koleng had no rebuttal. *Id.*

Further, the Court should reject Plaintiffs' unsupported assertions that the claims are limited to volume-based distribution measurement because this was standard in the pharmaceutical arts. The undisputed evidence showed that non-volume-based methods were used to determine DRSP particle size and distribution in the intrinsic prior art. For example, both Heil 076 and Davila used the number-based method of microscopy (optical counting), and Davila used both microscopy and sieve analysis (weight based). LPFF ¶ 75.

Any argument that different methods would not yield different results is unpersuasive. Plaintiffs' own documents show that the same batch of DRSP gave significantly different particle sizes when measured using the same measurement method, but with varying testing parameters. LPFF ¶¶ 76–77. In some cases, there was a three- to four-fold difference in particle size measurement, and in many instances the same particles fell inside or outside the claim scope. *Id.* Notably, differences of this magnitude resulted using the *same* method of analysis—not different methods altogether, as is permitted by the asserted claims here.

Thus, clear and convincing evidence demonstrates that the claims, which are not limited to a particular method of measurement or even a volume-based method of analysis, are indefinite. Any well-known method could be used, and those well-known methods yield substantially different results. As with the dissolution limitation, one could not know with reasonable certainty whether their product falls inside or outside the claims. The asserted '299, '632, and '487 patent claims are therefore invalid as indefinite.

### III.    CLEAR AND CONVINCING EVIDENCE SHOWED THAT EACH ASSERTED CLAIM WOULD HAVE BEEN OBVIOUS TO A POSA

Lupin proved by clear and convincing evidence that each of the asserted claims would have been obvious to a POSA as of the priority date.

### A.    The Art Did Not Teach Away from "Slow Release" of DRSP

Obviousness largely boils down to whether a POSA would have been motivated to develop a DRSP POP with a slightly slower release than prior art DRSP-containing COCs like Yaz®. There is no real factual dispute that a POSA would have been able to develop a product meeting the claimed limitations with a reasonable expectation of success had the POSA been motivated to do so.

The legal motivation threshold is low: "[O]bviousness does not require that the motivation be the *best* option, only that it be a suitable option from which the prior art does not teach away." *Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1328 (Fed. Cir. 2017) (emphasis in original). "The motivation to combine prior art references can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved." *Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1366, 1375 (Fed. Cir. 2020).

Plaintiffs argued that the crux of the purported invention was the recognition that a longer release of DRSP was possible, despite alleged warnings in the prior art that a fast release was necessary to avoid degradation in the stomach. Tr. at 554:14–18 (Perrin). But that argument was belied by the fact that patentees cited Huempel in the specification, were aware of Huempel's teaching that loss of bioavailability did not occur due to stomach acid *in vivo*, and had no reason to disagree with Huempel. Tr. at 475:15–24 (Velada), 558:11–25 (Perrin); JTX-004 at 1:66–2:7. Regardless, the subjective view of the inventors is not probative; obviousness is determined from

the objective perspective of a hypothetical POSA aware of all of the prior art. *See, e.g., Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984).

Contrary to Plaintiffs' allegations, the art never taught away from slower release, let alone that release could not be extended by a mere **30 minutes** (the difference between the disclosures in the prior art and the asserted claims). Certainly, some Schering references taught that rapid release was "an advantage" leading to "high bioavailability of the compound" by avoiding potential drug loss in stomach acid. DTX-426 at 4:8–13. But teaching an advantage is not teaching away. *Bayer Pharma*, 874 F.3d at 1327 ("[R]easons a skilled artisan would prefer one [option] over the other does not amount to a teaching away from the lesser preferred but still workable option."); *see also UCB, Inc. v. Actavis Lab'ys UT, Inc.*, 65 F.4th 679, 692 (Fed. Cir. 2023). Regardless, the art showed at least one alternative to fast release: an enteric coat. LPFF ¶ 79.

### 1.   *Bayer Schering v. Barr* Forecloses Teaching Away Because Fast Release Was Merely One Option

Plaintiffs' teaching away and lack of motivation arguments are effectively foreclosed by the strikingly on-point 2009 *Bayer v. Barr* decision. As previously discussed, the Federal Circuit affirmed the obviousness of Schering patent claims directed to COCs using fast-releasing, micronized DRSP (similar to the Heil references). *Barr*, 575 F.3d at 1346. "[Schering] claimed that its innovation was that the [DRSP] could be micronized to increase its bioavailability, and that the micronized [DRSP] would not need to be enteric coated for protection against the highly acidic gastric environment." *Id.* Like Plaintiffs here, Schering argued that "[DRSP] isomerizes when exposed to acid *in vitro*, teaching away from allowing exposure to the gastric environment." *Id.* at 1349. For its part, Barr presented evidence "that [DRSP] was found to isomerize slowly and would not have isomerized before the stomach emptied, [and] that the *in vitro* environment was too extreme to be compared to an *in vivo* practice." *Id.* at 1349–50. In affirming obviousness, the

Federal Circuit explained: "In effect, while [Schering] argued that prior art teaches away from using micronized [DRSP] in a normal tablet, Barr argued that the prior art teaches away from using an enteric coating. What the parties have done, however, is present the options available to a pharmaceutical formulator having ordinary skill to solve the problem of acid-sensitive but hydrophobic [DRSP]." *Id.* at 1349. A POSA thus had at least two clear options: "delivery of micronized [DRSP] by a normal pill" or "delivery of [DRSP] by an enteric-coated pill following the [prior art] teaching that the drug needs to be protected from the stomach." *Id.* at 1350. The art did not teach away, and the Schering claims were held invalid.

So too here. As in *Barr*, the prior art (Funke) suggested the same enteric coat solution as an alternative to fast release. LPFF ¶ 79. Teaching away therefore is foreclosed for the same reasons it was foreclosed in *Barr*. In fact, an enteric coat inherently taught towards a longer release because it would have prevented release in the stomach, delayed release of the formulation *in vivo,* and extended T$_{max}$. *Id.*; *see also Barr*, 575 F.3d at 1344 ("An enteric coating is a pH-sensitive film that protects the drug from stomach acid, and only releases the drug when it has passed into the less acidic duodenum and small intestine. . . . [Enteric coats] introduce a significant delay in the onset of therapeutic response.").

### 2. Huempel Taught that Loss of Bioavailability Did Not Occur While Teaching Towards Slow Release

Huempel (dated long after the Schering references) taught that the concerns about loss of bioavailability were illusory and did *not* occur *in vivo*, and even Dr. Velada was aware of this fact. LPFF ¶ 80. So even if certain Schering references previously taught away from slower release because of stomach acid (they did not), that was no longer a concern to a POSA as of the priority date—opening the possibility of the longer release period taught by Huempel. *Id*. In short, as of the priority date there was nothing inventive about recognizing that a longer release was possible.

19

But even if a POSA were to ignore Huempel (as Plaintiffs suggest) and believe that the acidic environment of the stomach could inactivate a portion of the DRSP dose, it was well known at the time that bioavailability (AUC) could be increased to compensate for the loss by simply increasing the dose. LPFF ¶¶ 81, 103. And as Dr. Gersh testified unrebutted, it was also known that because DRSP had no androgenic effects, it could be dosed at a higher level than previous androgenic progestins. *Id.* Thus, a POSA would have found it obvious to increase the dose of DRSP in the formulation to at least 4 mg, i.e., the upper end of the preferred prior art dosage range. LPFF ¶¶ 85, 87.

### B.    The Asserted Claims Are Invalid as Obvious Over Huempel and Davila

The combination of Huempel and Davila renders the asserted claims invalid as obvious. The asserted claims contain subsets of the following seven limitations, each of which is taught by Huempel, Davila, or both: (1) pharmaceutical composition; (2) 4 mg (or 3–4.5 mg) DRSP; (3) DRSP of a particular particle size; (4) without estrogen; (5) less than 50% of the DRSP is dissolved in 30 minutes when subjected to a USP XXIII Paddle Method test; (6) the formulation has a specific pharmacokinetic profile; and (7) a 24/4 dosing regimen.

It is undisputed that Davila teaches a contraceptive pharmaceutical composition of 2–4 mg DRSP (without estrogen) wherein the DRSP particles range in size from 30 to 90 μm. LPFF ¶ 37, 85. Moreover, Davila teaches an exemplar DRSP-containing formulation with a slowed dissolution profile falling withing the claimed range. *Id.* Davila also suggests a non-continuous dosing schedule for its disclosed compositions. *Id.*

Huempel likewise undisputedly teaches contraceptive pharmaceutical compositions containing 3 mg DRSP. LPFF ¶ 86. Huempel further teaches immediate and modified release profiles for its DRSP-containing compositions with the desired $C_{max}$ and AUC parameters. *Id.* Moreover, the modified release profiles taught by Huempel bookend the claimed $T_{max}$ range of the

asserted claims and, as outlined below, provided both a basis and motivation to a POSA for a $T_{max}$ ranging from 2.2 to 6 hours. *Id.* Huempel also taught that its DRSP-containing formulations could be dosed in a 24/4 dosing schedule. *Id*. Accordingly, together, Davila and Huempel teach the limitations of the asserted claims, thus rendering them invalid as obvious. LPFF ¶ 84.

### C. A POSA Would Have Been Motivated to Make DRSP Tablets, Free of Estrogen, in the Claimed Dosage Ranges

As a threshold matter, the undisputed evidence shows that a POSA would have been motivated to make DRSP POP tablets, free of estrogen, at the claimed dosages with a reasonable expectation of success. LPFF ¶ 87. To begin, these kinds of tablets already existed in the prior art as shown in, e.g., Davila. LPFF ¶ 88.

Good reasons existed to make a DRSP POP as of the priority date. As a class, POPs had been FDA approved for contraceptive use since the 1970s and serve an important clinical role in women who are, for example, breastfeeding or intolerant of estrogen. LPFF ¶¶ 20, 22. As of 2010, DRSP was established as a preferred fourth-generation progestin due to its superior properties compared to other progestins, such as its lack of androgenicity. LPFF ¶¶ 23–30. And by 2010, patent protection on DRSP itself had expired, rendering it available for commercial development barring Schering's limited formulation patent coverage. *See* LPFF ¶ 35.

Estrogen-free DRSP tablets were also known in the prior art. LPFF ¶ 88, 90; *see also id.* ¶ 21. In addition to the disclosures of Davila, set forth above, other references, such as Heil 892, describe DRSP-only tablets and that the preferred dosage of DRSP to inhibit ovulation was 2 to 4 mg. LPFF ¶¶ 38, 88–89.

There was no real dispute that a POSA considering the prior art could have easily made formulations meeting the broad claims. Tr. at 702:15–22, 707:14–18 (Koleng). In fact, Plaintiffs achieved their targeted dissolution and pharmacokinetic profiles on their first attempt. LPFF ¶ 83;

*see Rothman v. Target Corp.*, 556 F.3d 1310, 1319 (Fed. Cir. 2009) ("[T]he inventive process shows the predictability and expectations in this field of art"). Thus, the only real dispute is whether a POSA would have been motivated to make the claimed inventions.

### D.    A POSA Would Have Been Motivated to Develop a Product with the Claimed Pharmacokinetics.

A POSA would have been motivated to combine Davila and Huempel to develop a DRSP POP with the claimed pharmacokinetics with a reasonable expectation of success. DRSP's pharmacokinetics were well-understood and predictable as of the priority date. LPFF ¶ 93. A POSA would have been able to target and obtain the claimed pharmacokinetics without undue experimentation and would have been able to do so through modification of particle size. *Id.*

Huempel discloses all the functionally-claimed pharmacokinetic elements, with the sole exception of the claimed $T_{max}$ range of 2.2 to 6 hours—a range sandwiched directly between two $T_{max}$ disclosed in Huempel (1.7 and 10 hours). LPFF ¶¶ 94–98. The table below summarizes the pharmacokinetics of the 3 mg DRSP formulations reported in Huempel compared to the claimed pharmacokinetics, with overlap noted in green.

|  | Claimed Ranges | Huempel IR | Huempel MR |
| --- | --- | --- | --- |
| $T_{max}$ (h) | 2.2 – 6 | 1.7 | 10 (max) |
| $C_{max}$ (ng/ml) | <30 | 37 | ~ 17-18 |
| AUC $_{0h\text{-}tlast}$ (ng*h/ml) | At least 300 | >350 | >600 |

*Id*. Schering's own testing of a 3 mg immediate-release DRSP POP showed similar pharmacokinetics. LPFF ¶ 94.

At trial, Plaintiffs suggested that a POSA would not have combined Davila with Huempel because Huempel is directed to modified release formulations containing DRSP with the estrogen 8-PN. Tr. at 698:6–17 (Koleng). But Plaintiffs' argument is belied by the fact that Huempel is cited

on the face and in the specification of the asserted patents. JTX-004 at 1:66–2:7 (citing WO2008031631, i.e., Huempel).

Huempel teaches that degradation of DRSP in the stomach was *not* a concern and did *not* actually result in loss of bioavailability. LPFF ¶ 100. This teaching cleared the way for a longer release POP. More importantly, Huempel models the pharmacokinetics of such a product and shows, for example, that extending the $T_{max}$ results in a lower $C_{max}$, a lower peak-to-trough ratio, and a higher through level of DRSP. LPFF ¶ 95. As explained by Mr. Perrin, that is the crux of the purported invention. LPFF ¶ 78.

Motivation to make a formulation with the claimed properties or to combine Huempel and Davila existed in multiple forms. First, the claimed $T_{max}$ is bounded by Huempel (LPFF ¶ 100) and a POSA would have quickly arrived within the claimed range by routine experimentation. "The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of . . . ranges is the optimum combination." *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003); *see also E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018) (collecting cases) ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation."); *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012); *see also Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020); *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 642 F.3d 1370, 1372–73 (Fed. Cir. 2011) (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) ("[W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of obviousness.").

Second, an intermediate T*max* would have been "obvious to try" because there are limited values between 1.7 hours and 10 hours that are *not* in the broad range of 2.2 to 6 hours. *See Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 955 F.3d 25, 34 (Fed. Cir. 2020) ("The bounded range of pH 3 to 4 presents a finite number of narrower pH ranges for a skilled artisan to try."). These facts alone are legally sufficient motivation.

Third, a POSA had practical, commercial incentives to design around Schering's patent, which claimed (and therefore blocked) DRSP products free of estrogen with a rapid release rate and/or containing micronized DRSP. *See* LPFF ¶¶ 78, 90, 102, 105; *see also Acorda Therapeutics, Inc. v. Roxane Labs, Inc.*, 903 F.3d 1310, 1339 (Fed. Cir. 2018) (blocking patents "reduce incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent."). It naturally follows that Schering's patent created a corresponding incentive for POSAs interested in developing a DRSP POP to work *outside* the blocked space—particularly because DRSP itself was patent-free. POSAs would have been channeled toward slower release and non-micronized DRSP—both of which are part of the asserted claims. This is consistent with the inventors' own view that their work (like any similarly-situated POSA) was "conditioned by Bayer's patents" such they could "not use micronized drospirenone" and required "[d]issolution <70% in 30 minutes." *Id*.

Fourth, the evidence showed that a POSA had actual motivations to choose an intermediate T*max*. To begin, undisputed evidence showed that the wide T*max* range claimed (2.2 to 6 hours) corresponds with the transit time of a tablet in the small intestine, where drug absorption and bioavailability is greatest. LPFF ¶¶ 99–100. This period would have been particularly important for a POSA concerned about bioavailability loss in the stomach and, likewise, would have provided motivation.

A POSA would have also understood that a $T_{max}$ longer than 1.7 hours would produce a lower $C_{max}$ and lower blood fluctuations (i.e., lower distance between $C_{max}$ and $C_{min}$) which, in turn, would result in a tighter therapeutic range and, correspondingly, expected benefits for patients. LPFF ¶¶ 95–97, 101. Huempel teaches this, stating "high drug fluctuations after oral administration can be avoided by a modified release system and thereby incorporate the advantage of a quasi-constant drug influx[.]" *Id*. ¶ 96. The reduction in $C_{max}$ and blood fluctuations shown by Huempel are precisely what the patents point to as their alleged advantages. *E.g.*, JTX-004 at 2:15–20.

And Huempel teaches another potential advantage of a slower DRSP release that would have motivated a POSA—it permits the use of a lower daily dosage to achieve the desired therapeutic effect. LPFF ¶ 101.

### E.    A POSA Would Have Been Motivated to Use the Claimed Particle Sizes to Achieve the Claimed Pharmacokinetics and Obtain the Claimed Dissolution Profile

DRSP's particle size, dissolution rate, and pharmacokinetics are interrelated.[2] LPFF ¶ 106. In effect, particle size and pharmacokinetics are *the same thing* for DRSP, a BCS Class II drug, and represent the same optimization between known prior art bounds. This connection was generally understood as of the priority date. LPFF ¶¶ 108–11. DRSP particle size was known to determine dissolution rate, which, in turn, determines pharmacokinetics. *Id*. This was also known from theory because, pursuant to the Noyes-Whitney relationship, particle size and dissolution rate are linked: the larger the particles, the slower the release and, for BCS Class II drugs, the slower and lower the pharmacokinetics (and vice versa). LPFF ¶¶ 107–08. Because DRSP is rapidly

---

[2] In its obviousness analysis, Lupin assumes that the dissolution limitation of the asserted claims includes at least the testing parameters used in Example 2 of the specification (i.e., 900 mL of water at 37ºC, 50 rpm), which are the same conditions used in Davila. LPFF ¶ 52.

absorbed, dissolution determines how quickly and how much DRSP enters the bloodstream. LPFF ¶ 108.

Davila empirically demonstrates the predicted relationship between particle size and dissolution rate in Figure 1, when comparing Example 3 with Yasmin®. LPFF ¶ 111. Yasmin®, with its very small (micronized) DRSP particles, showed very rapid release and was known to have correspondingly rapid pharmacokinetics. *Id.* Example 3 shows much slower dissolution and, therefore, would have been expected to have much slower release rate in the body (i.e., lower $C_{max}$). *Id*.

Undisputed evidence also shows that the claimed particle size modification would have been an obvious means to achieve the functionally claimed pharmacokinetic ends. Here, the claimed particle size ranges are bounded by the prior art in the same manner as pharmacokinetics. The claimed particles sizes and distributions are intermediate between those disclosed in the prior art. Davila discloses, e.g., micronized particles (less than 10 µm) at the low end and 30–90 µm on the upper end. LPFF ¶ 112. The *only* difference between the claimed ranges and the particle size of Davila is the median ($d_{50}$) value—the $d_{10}$ and $d_{90}$ value are met by the prior art, and all particles were less than 200 µm. *Id*. Given the known connection between pharmacokinetics and particle size, it would have been obvious and routine to use particle size to optimize pharmacokinetics. *See* LPFF ¶ 113. Particle size was a particularly good method because it did not require the addition of a new component such as a surfactant. LPFF ¶ 109.

## F.    A POSA Would Have Been Motivated to Use 24/4 Dosing

Clear and convincing evidence also showed that use of a 4 mg DRSP POP with the claimed pharmacokinetics in a 28-day cycle consisting of 24 days of active pills followed by 4 days of placebo pills in asserted claim 7 of the '249 patent would have been an obvious means to provide effective contraception.

A 24/4 dosing schedule was already approved by the FDA for use with Yaz® to provide effective contraception. LPFF ¶¶ 34, 115. A POSA therefore would have expected a 24/4 schedule to provide effective contraceptive efficacy with DRSP alone. And prior art such as Davila and Anttila taught the use of a DRSP POP with a discontinuous 28-day cycle consisting of 21 days or more of active therapy and 7 or fewer drug free days; indeed, Anttila taught a 24/4 dosing schedule for contraceptives containing DRSP. LPFF ¶¶ 36, 117–18. Finally, the undisputed evidence showed that, from a pharmacokinetic perspective, an effective amount of DRSP would remain in the blood following a four-day period of no drug. LPFF ¶¶ 116, 119.

Accordingly, the Court should find each of the asserted claims invalid as obvious.

## IV. THE ASSERTED CLAIMS OF THE '122 PATENT AND THE '249 PATENT, HAVING NO PARTICLE SIZE LIMITATIONS, ARE INVALID FOR LACK OF WRITTEN DESCRIPTION

The asserted claims of the '122 and '249 patents contain no limitations to DRSP particle size and are broadly directed to any 4 mg oral dosage form meeting *functional* dissolution and pharmacokinetic limitations (or their use as contraceptives). Lupin demonstrated by clear and convincing evidence that these claims lack adequate written description. The legal inquiry of written description, a fact issue, asks "whether the disclosure of the application … reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).

The claims here are directed to a broad, functionally claimed genus (i.e., almost any formulation that meets a broad *in vitro* dissolution profile and a broad *in vivo* pharmacokinetic profile.). "The [written description] problem is especially acute with genus claims that use functional language to define the boundaries of a claimed genus." *Id.* at 1350. When a claim covers a genus, the specification must disclose a representative number of species falling within the

claimed genus. *Id.* Alternatively, the specification must disclose "structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Id.* ("[M]erely drawing a fence around the outer limits of a purported genus is not an adequate substitute for describing a variety of materials constituting the genus and showing that one has invented a genus and not just a species."); *see also Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568–69 (Fed. Cir. 1997).

Here, the limited disclosure in the specification does not demonstrate that the inventors had possession of the full scope of the broadly claimed genus. The specification is almost entirely directed to a single means of achieving the functionally claimed dissolution and pharmacokinetic profiles, i.e., the prior art method of manipulating the size of the DRSP particles. LPFF ¶¶ 123–25. The only working pharmacokinetic formulations that met the claim limitations are direct compressed tablets having almost identical formulations and including DRSP with a narrow $d_{50}$ particle size of around 20 μm. LPFF ¶ 124. The specification references two other example formulations (that do not meet the pharmacokinetic limitations of the claims) that are different from the "inventive" formulations, but all it says about their formulation is that they contain "non-micronized" DRSP. LPFF ¶ 125.

Though Dr. Velada testified that Plaintiffs attempted three different methods of making slow release DRSP formulations meeting the claims, he admitted that the patent includes formulation information only for embodiments where the size of the DRSP particles dictates the dissolution rate (and thus the pharmacokinetic parameters). Tr. at 472:14–473:13 (Velada). The lack of disclosure of other formulations comes as no surprise; one of the inventors' main goals was to avoid Schering's "blocking" prior art patents claiming micronized DRSP and a quick dissolution profile. LPFF ¶ 105.

Other than a description of how to accomplish the invention by controlling DRSP particle size, the specification includes just two short paragraphs listing other tools that may be useful to achieve the functional claim limitations:

> A DRSP containing composition with such an *in vitro* dissolution profile or the *in vivo* pharmacokinetic profile fully-described above may be achieved by various other ways.

> By routine experiments and in view of his general knowledge, one skilled in the art may modify (i) the particle size distribution of DRSP and (ii) the amounts and the nature of excipients in order to obtain other alternative compositions displaying the *in vitro* dissolution profile and the *in vivo* pharmacokinetic profile described in the present application. For example, one skilled in the art may conceive a composition comprising (i) micronized DRSP together with (ii) a slow release agent in order to diminish the dissolution rate of said DRSP. One skilled in the art may also combine (i) large particles of DRSP together with (ii) a surfactant and/or a wetting agent in order to ensure the dissolution of said DRSP.

LPFF ¶ 126–27. But this cursory reference to other methods to try is nothing more than an invitation to experiment with different techniques. It is certainly not sufficient disclosure to demonstrate that the inventors possessed other methods of accomplishing formulations meeting the functional claim limitations. LPFF ¶ 128; *Noven Pharms., Inc. v. Amneal Pharms., LLC*, No. CV 18-699-LPS, 2020 WL 11191445, at *38 (D. Del. Sept. 4, 2020) (*citing Ariad*, 598 F.3d at 1349) ("[A] specification that conveys possession of nothing more than tools that may be useful to pursue a claimed invention does not convey the required possession of the invention itself.").

Plaintiffs spent considerable time during trial attempting to establish that a POSA *could have* accomplished the invention utilizing different methods, or that it would have been obvious to try other methods. Tr. at 702:9–709:12 (Koleng), 218:14–222:4, 227:19–230:22, 336:9–338:18 (Buckton). However, whether a POSA would have been enabled to do so is a different question than whether the four corners of the patent demonstrate that the inventors possessed other such methods of doing so commensurate with the broad scope of the claims. *Ariad*, 598 F.3d at 1351.

Similarly, "a description that merely renders the invention obvious does not satisfy the [written description] requirement." *Id.* at 1352.

The facts here are strikingly similar to those of *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435 (D. Del. June 1, 2021). There, Judge Bryson (sitting by designation) held on summary judgment that claims to methods of using oral testosterone formulations were invalid for lack of written description. *Id.* at 438–39. The claimed methods were directed to achieving certain pharmacokinetic targets. *Id.* at 440–41. There, as here, the claims did not limit the formulation to any particular excipients, and the court found that "the asserted patents are very broad, and the number of operative species disclosed in the specification is very small. And there is no evidence in the patents, or otherwise in the record, that the few operative species are representative of the broad genus that the inventors sought to cover with each claim. In short, the claims are directed to a forest, and the specification contains very few blaze marks identifying the particular formulations that can be used to satisfy the functional limitations of the claims." *Id.* at 449, 458.

The same is true here. The specification "does not disclose a variety of species that accomplish the [claimed] result." *Ariad*, 598 F.3d at 1350; *see also Eli Lilly*, 119 F.3d at 1568. ("The description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve if one made that invention."). Further, there was no evidence at trial of "structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Ariad,* 598 F.3d at 1350. The claims here merely recite a problem to be solved—certain dissolution and pharmacokinetic profiles—while claiming all solutions.

As in *Eli Lilly* and *Ariad*, the claims here cover any composition later invented and determined to fall within the claims' functional boundaries—leaving it to the pharmaceutical

industry to complete an unfinished invention. Lupin's Product is but one good example of the deficiency of the specification's disclosure. It is the classic "unfinished invention." Nothing in the specification describes anything akin to Lupin's method of controlling dissolution by combining amorphous DRSP into a pH dependent, slow-release, polymer film. LPFF ¶¶ 128–32. While the pharmacokinetics of Lupin's Product and SLYND are comparable, the dissolution characteristics of the two are not. LPFF ¶¶ 57–58. Nevertheless, Plaintiffs erroneously contend that Lupin's product is covered by these claims. *See Rivera v. Int'l Trade Comm'n,* 857 F.3d 1315, 1319–23 (Fed. Cir. 2017) (finding that the patent's failure to describe the allegedly infringing mode supported a finding of invalidity for lack of written description).

In short, after receiving Lupin's February 2022 Paragraph IV notice letter disclosing that Lupin's Product did not meet the particle size limitations of the then-issued patents, Plaintiffs filed multiple continuing applications that removed particle size limitations from the claims. LPFF ¶ 3. These broad claims cover every oral 4 mg formulation that meets the claimed dissolution and pharmacokinetic requirements. However, the specification shows only that the inventors achieved the claimed slow dissolution profile and delayed pharmacokinetics by moderating the size of the DRSP in the formulation. LPFF ¶¶ 123–25. There is no legitimate indication within the four corners of the patent that they were in possession of any other method to accomplish the same. Therefore, the broad, asserted claims of the '122 and '249 patents are invalid for lack of written description. The specification simply does not provide a description of sufficient and varied species spanning the broad scope of the genus claims.

## V.    CONCLUSION

Based on the foregoing, Lupin respectfully requests that this Court find the asserted claims of the asserted patents invalid.

Respectfully submitted,

Dated: March 29, 2024

*/s/ David A. Bilson*

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806-4204
Telephone: (302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

*Of Counsel:*

Michael Nutter
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
mnutter@mcguirewoods.com

Corinne S. Hockman
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601-3071
chockman@mcguirewoods.com

Daniel Withers
MCGUIREWOODS LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201-2648
dwithers@mcguirewoods.com

Merritt Westcott
MCGUIREWOODS LLP
845 Texas Ave., 24th Floor
Houston, TX 77002-2904
mwestcott@mcguirewoods.com

Dennis D. Gregory
MCGUIREWOODS LLP
300 Colorado Street, Suite 2300
Austin, TX 78701-3925
dgregory@mcguirewoods.com

*Attorneys for Defendants Lupin Ltd.*
*and Lupin Pharmaceuticals, Inc.*